Good morning. May it please the court. Mariah Radin from the Office of the Federal Public Defender, appearing on behalf of Petitioner Appellant Donald Sanders. I'd like to reserve two minutes of my time for rebuttal. Lanny Thomas, the prosecution's star witness, refused to answer questions related to the identity of two eyewitnesses, including one shooter, and other witnesses present at the Rare Breed Clubhouse on the night of the shooting. These questions were material. They were non-collateral, because they went to Mr. Sanders' ability to defend himself against the charges. The result was a violation of Mr. Sanders' Confrontation Clause rights. Wait. A violation of his rights because why? The witness was there, right? The witness was there. He did submit to some cross-examination, and he selected questions not to answer, covering various categories that related both to what he observed that night and to his direct testimony. But the jury was instructed that they could take that demeanor or that conduct into account in judging that witness's credibility. Yes, Your Honor. Isn't that sufficient? No, Your Honor. The instruction did not cure the violation. The information that he refused to offer was directly inculpatory to Mr. Sanders. The only remedy was the answers to the questions or to strike that witness's testimony in its entirety. You know, I had a case once with a trial judge, surprisingly affirmed by a Supreme Court, called U.S. v. Owens, where the witness got up on the stand. This was a prison beating of a prison guard, and he couldn't remember who did what. But the Supreme Court said, well, the fact that he was on the stand and showed he couldn't answer was enough. That's confrontation. I understand, Your Honor, and I believe that that argument is made in this case as well. And this isn't an instance in which the witness could not remember. No, but he didn't answer. Just like the other case, he didn't answer. The other person couldn't answer. This one wouldn't answer, or maybe he couldn't. But the point is the jury had the benefit of seeing his response to the question. Isn't that confrontation? It is an element of confrontation, but it does not go to the heart of what the Confrontation Clause guarantees, which is the cross-examination, particularly with a witness who's fully capable of answering the question. Counsel, can I ask you a question? You said it's directly inculpatory, and I want to get back to that. But just to be clear, there was a subpoena issued to get the members of the clubhouse or club, and that was disregarded. Correct. So he couldn't look to other witnesses to figure out who saw what that night? Correct. And I understand your appeal to encompass that. And then there's the refusal to testify. But it seemed to me in the record that the judge cautioned the witness to go think about it over the weekend because he'd be held in contempt if he didn't answer. And then the briefing doesn't really tell what happened, except that he wasn't held in contempt. That's correct, Your Honor. He returned to court, stated that he had had a meeting. He attended a meeting at the clubhouse with other members. He had discussed his testimony. He had informed everybody he was refusing to answer. He informed the judge on Monday that he would not answer any questions, even if held in contempt. The judge made a decision that holding him in contempt was unlikely to compel the testimony and instead allowed the defense attorney to cross-examine him regarding some element of his refusal. Well, you said he gave them a broad right to cross-examine. So I take your point. But what concerns me is that this does seem to be a bit one-off because he's not saying he even implausibly saying that he didn't remember. He's just flat-out refusing to testify. That's correct. And he explained that somebody, he'd made an identification. Somebody sort of whispered in his ear from the club that that was wrong. He recanted. So my concern is with this other person coaching him. And was the identity of that person ever revealed? No, it was not. And it appears from the record that there were multiple people. There were people who originally told him this is who the shooter is. There are people, different people, I believe, who later told him, no, that's not who the shooter is. Well, the shooter. They're talking two shooters, right? That goes to your point about directly inculpatory because this was all about identifying a different guy, not Sanders, right? I think there's an element that is overlooked about how his testimony regarding S1 and S2, the shooter suspect 1 and suspect 2, how that is directly inculpatory to Mr. Sanders that he was not able to confront. Could you speak to that? That is because Mr. Thomas talked at length about how Mr. Sanders was connected to these two people. He came to their aid, their friends, their buddies. That's why Mr. Sanders was involved. He shot because his friend is losing a fight. He knows how to identify that individual, S1 and S2, but he refuses to offer that information. So Mr. Sanders, who otherwise had very little context for this shooting, he claimed he's an innocent man outside of the clubhouse. To the extent he was involved, this is a fight that came out of disrespect to two young women. He was not involved in that fight. The S1 and S2 are decades younger than he was. They're probably involved in gangs. There's no allegation he's involved in gangs or that he otherwise knew them except for Mr. Thomas. Didn't Lanny say they were a member of a rival gang or at least another gang? He did. He testified that he believed they were members. At least S1 was a member of a blood sect. I don't think he used the word rival. My understanding is it's just clear that there were two different gangs, members of a different gang. Members of a gang, whereas Mr. Sanders is by no means a member of a gang and is strictly a member of a motorcycle club, not a gang, that he was there to show off his motorcycle and to attend this event. He had otherwise no reason for being involved in this fight, no placement with S1 or S2 or related to this incident at all, except through Lanny Thomas' testimony. Okay, but your time is ticking. So why is the identification of S1 potentially inculpatory, please, as to Sanders? Because Sanders couldn't rebut this whole theory for why he's involved, and the prosecutor reiterated it in closing. He used Thomas' words. He said that's his motive, those are his guys, that's what Mr. Thomas says. He came to their assistance. That's all you need to know. And Sanders had zero ability to confront that whole line of testimony, and Thomas taunted him, saying, no, no, you know, I don't have to say anything. So the jury's not left with he could take shots at it on cross-examination and try to undermine, but the jury's not left with an alternate explanation. Is that it? Correct. He foreclosed his entire ability to access that information, both by refusing to comply with the subpoena, refusing to give up the identity of any other witnesses present that night, and refusing on cross-examination to disclose the identity of the people who know S1, as well as the people who directed him to accuse an otherwise innocent man of being a shooter, and then told him not to do it. Is there any authority for the proposition that Sanders is entitled to have the judge invoke his powers of contempt to try to get the witnesses to testify, because the witness wasn't pretending that he didn't know or couldn't remember, he was just refusing. Is he entitled to that? Your Honor, I think it still wouldn't remedy the confrontation clause violation. So I am not sure if he's entitled to it, but it wouldn't address the confrontation issue. I think Judge Roof has a question. I do. The confrontation clause errors are subject to harmless error analysis, correct? Correct, Jan. And you argue that the California Court of Appeals erred in finding that the violation here that you claim was confrontation clause violation was harmless. So I hear what you're saying about he had no opportunity to prove his alternative theory, his theory of defense. But actually, where is the actual prejudice? When the cross-examination, even on recross, was extensive, it wasn't just hours, it was more than a day, and coupled with the trial court's instructions, where is your actual prejudice? I'd like to make a few points in response. First, just to note that it should be a de novo review of the prejudice element because the California Court of Appeals never addressed it. So it's not subject to the constraints of the 2254 analysis. It is a de novo review. The harm would be twofold or even more. First, he wasn't able to present this theory. Though cross-examination was allowed, he never got the answers to the questions. That should have been attainable. So the actual remedy, the actual information that would have allowed him to confront this witness was never disclosed. A lot has been made of the length of the cross-examination. I think it's important to note, though anecdotal, this trial lawyer was incredibly verbose, his defense counsel. He cross-examined a recipient witness at length over hours. There were about four prosecution witnesses, and this is a nine-volume reporter's transcript. He asked on cross-examination, please explain that to me. Tell me what you're thinking. What do you mean by that? So his entire cross-examination of every single witness was lengthy. That does not automatically mean he ever was able to get the answers that he needed or Mr. Sanders was able to confront the witness against him. Well, you also say that the Court of Appeal incorrectly relied on the collateral matters test in Cardillo. Absolutely. But why is Cardillo, the use of it, incorrect? Isn't it? Is using Cardillo inconsistent with Supreme Court precedent on the confrontation  It is, Your Honor. The Cardillo test, which says that cross-examination related to credibility is a purely collateral matter and therefore can be used against the defense, even if there was no cross-examination, is directly in conflict with both Davis and Davis v. Alaska and Delaware v. Van Arsdale. How do you define a harmless error in the context of this kind of error, assuming there was a violation of the Confrontation Clause? Your Honor, I think had the testimony been stricken, what the evidentiary framework would have looked like at that time. Well, that doesn't answer my question. How do you define harmless error? In this context, it's whether there was a substantial injurious effect under Brecht, but it's whether he would have been likely to be acquitted or at least have a hung jury if Mr. Thomas' testimony was stricken. And given the strength of the defense case and looking at the prosecution's closing argument where he emphasized Thomas' testimony, he emphasized his credibility. Well, you're arguing now why you think it's not harmless error, but I still don't understand a precise definition. Well, legally, the Brecht test in this context incorporates the factors from the Van Arsdale case, so it's looking at the importance of the testimony, whether other testimony would have replaced this testimony, the strength of the government's case overall. And I know I'm going over my time, so I do think I've addressed that. But the prosecutor did emphasize Mr. Thomas' testimony and emphasize Mr. Thomas' credibility, even saying this is a principled man who could have answered questions, but based on his principles, he chose not to. So that makes him even more reliable, which shows that the curative instruction simply wasn't effective. Thank you, counsel. We'll put a couple of minutes back on the clock when you come back for rebuttal, so you can plan accordingly. We'll hear from the government, please. Good morning, Your Honor. Stephanie Santoro, Deputy Attorney General for Appellee. As Your Honor has already noted, the defense counsel was given significant latitude in cross-examining Thomas on this point, and though he was a rather verbose attorney, the transcript, which spans nearly 80 pages,  but he really painted him out to be this evasive, evasive, renegade. He was totally evasive. He was refusing to answer the question right in front of the jury. So you got that. Yes. Absolutely. So what do we do about this? The judge said, I think he said something about this, make the hair stand up on the back of my neck. This is a very serious trial, and he's just flat refusing. It's not that he doesn't remember. In fact, he's testified after identifying a witness that he changed his story about who the witness was because somebody else told him. What about that? Is there anything comparable in our case law? There is not. A lot of the cases I cited, including U.S. v. Owens, do point to memory loss or obsolete confusion, but the Supreme Court has said that the confrontation clause guarantees a full and fair opportunity to cross-examination. It's not going to guarantee that it's going to be to the extent or go in the manner that defense may wish. Why isn't it full or fair that the judge should threaten this person who's just flat refusing after having admitted that somebody coached him in such a serious trial? The judge should at least employ the content power to allow the defendant to try to explore this very important line of questioning. Well, you know, I do empathize with the trial court here. I think he noted on the record that he had never been faced with such a conundrum. Right. And the trial court, given the chronology of the proceedings, where it began Friday afternoon where this was exposed, took a break over the weekend for the recess and then resumed on Monday, and also told the parties of his tentative, including telling this witness and threatening him with the content power. The trial court ultimately decided that given everything that had come forth so far, that Thomas had testified for nearly a day and a half, and his testimony was helpful to both sides, that holding him in contempt, throwing him in jail for five days, the court was concerned about losing jurisdiction. Obviously a monetary sanction seems a little bit ineffective possibly here. And so the trial court felt well, and it did contemplate striking the entire testimony as petitioner would have it here. But again, given the points that I just noted, he felt it was too drastic. How was Thomas' testimony helpful to the defense? Helpful to the defense. Right. Well, I don't know that his testimony per se, the substance is helpful to the defense, but it certainly handed the defense a very potent weapon in terms of defense counsel really attacked his credibility. Thomas' credibility was entirely shot on recross examination, and then coupled with the specially tailored curative instruction that told the defense counsel that if it felt that Thomas was concealing evidence, refusing to answer questions, it could disregard Thomas' entire testimony. There was no wishy-washy instruction here. So in light of these points, there was more than a full and fair cross examination. Defense counsel took advantage of it, argued it in closing argument. And to the extent your Honor's have concerns about this, it's very easily resolved on prejudice. Because of Rodney. Because of Rodney. So Rodney identified Petitioner as one of the shooters both in the six-pack and also at trial. He never once equivocated. Yes, there was some issue about his ideas to this Johnny Clark person. He never once equivocated on Petitioner as one of the shooters. Right. See, there were really two eyewitnesses to the two shooters, and Rodney's one of them. But Rodney also was a victim, and he's also legally intoxicated, right? That's the problem with Rodney. He is intoxicated. I also would like to point out that Joel made an identification of Petitioner. And Joel was seriously intoxicated. And Joel said he didn't know who shot him. He did not. But Joel identified Petitioner in a six-pack as the person approaching him during the melee. So, yes, granted he did not see Petitioner pull out a gun and fire the gun. What was his testimony at trial? Didn't he say at trial, I don't know who shot me? Yes. Yeah, right. And that's what the jury heard. He didn't know. Yes. But there's the other victim, Joel's father, Rodney. Yes. Who was also intoxicated but did not equivocate. Right. As I read the record. And those were issues of credibility of the witness. It went to the weight of the evidence. If the jury, let's say, took defense counsel at its invitation in the trial court to strike all of Lanny Thomas' testimony, they're left with Rodney's testimony. And on that basis, they convicted him. And, therefore, it was harmless underbrect. For those reasons, the district court judgment should be affirmed.  Thank you, counsel. Any further questions? Yes. I have one, counsel. I think there is one. Forgive me. There were specific state court factual findings, right? And whether or not the California Court of Appeals' decision was based on an unreasonable factual determination under 2254D2, I want you to tell me, were these three factual findings at issue unreasonable? That one, that Thomas refused to answer only one question, because it seemed to me a series of questions, one issue. B, that there was nothing to support the assumption that there were undisclosed eyewitnesses to the shooting. And that Thomas' undisclosed sources never suggested that they witnessed the So, what is the evidence in the record supporting each of those findings? You've argued some already, but you said that there was only one question, and that's what the trial court said. But it was more than that. Yes, I do acknowledge that, Your Honor. And before I reach that point, as I noted in my brief, the D2 claim is waived. It was not raised, and it was not properly before the district court, so it is not properly here. The case law does not say that D2 claims cannot be waived. D2 claims can be waived, but the standard of review under D2 cannot be waived. So I'd like to clarify that point first. Now, as to those three factual findings, which I addressed in my brief, first, whether or not the state court erroneously found only one line of question or, excuse me, one question was not answered, I think we do agree that a reading of the record shows that it was more than one question. But the state court, I would interpret it as more one line of questioning. It really is all about his source. Thomas refused to identify his source, whether it was his source for the wrong identification, his source for who the members were at the club. And the trial, excuse me, the court of appeal opinion, though it does say Thomas refused to answer one question,  so I don't think that, I do think you could reasonably interpret that the state court was saying it was a line of questioning. As to point number two, which is the argument that there is nothing to support petitioner's assumption that there were undisclosed witnesses to the Malia and the shootings, the trial court, the state court, excuse me, was not unreasonable in finding that because the record does show that both Thomas and Rodney stated that there were, I think, eight people at the shooting during the incident. It was Thomas, Rodney, Joel, the two girls, S1, S2, and petitioner. And there may have been conflicting testimony that there were possibly others in the vicinity of the bar, but the fact that there was that testimony makes the state court factual determination not unreasonable. The third point that the court of appeal unreasonably misapprehended the record when it found Thomas' sources never suggested that they witnessed the incident or that Thomas' idea of petitioner was mistaken is not unreasonable. One, Thomas, I don't believe that Thomas in his testimony said that his sources saw the incident. He said that- But they told him he had the wrong guy. They told him he had the wrong guy. The sources knew who S1 was, but as I argued in my brief, the sources could have known who S1 was without seeing the incident. I thought your argument was the sources could have known that S1 was somewhere else, that the person that Lanny had identified, S1, was actually, you know, out having pizza that night or something. Not that they knew who S1 was, but actually was, but that the person he identified was somewhere else. Are you making a different argument now? Well, I think they-I do make that first argument that you're saying, which is- Okay. They knew this guy was out having pizza or babysitting, so therefore he was not there. But there is also testimony that Thomas provides that says his sources knew who S1 was. And I'm saying that it is reasonable for the court of appeal to have determined that the sources knew who S1 was without witnessing the incident. And I guess one plausible scenario might be that-and I see I'm running out of time- one plausible scenario might be that maybe they heard about it or, you know, it's a tight motorcycle club and they know who's who and they know who showed up at the opening, but they weren't actually there. The last point is that Thomas's identification of Sanders was mistaken. And there hasn't been anything about sources saying that Petitioner was not one of the shooters. I know that defense makes much of the fact that his guy was outside. He provided two witnesses who testified in the defense's case saying that Petitioner was outside. Any additional possible witnesses that could have come forward, that is entirely speculative. We don't know what their testimony would be. And assuming that they testified that Petitioner was outside, that, too, would arguably have been cumulative. The district court decision should be reaffirmed for those reasons. Thank you. Thank you for additional time. Regarding the D2 facts that were left off, the issue of waiver was addressed in the reply at page 10. He did cite D2 and argue it. He was pro se. It should be liberally construed. There are additional cases cited regarding waiver. The issue of additional eyewitnesses, just factually, there was an officer, a police officer, who was alleged to be outside during the time of the shooting. That was not, his name was never provided. And certainly that would not have been cumulative to other witnesses. One police officer was identified as being in the courtroom. And I don't think he was ever then called or there was no indication that there was follow-up on that person. Is that right? That's correct. And that officer was in a bathroom at the time of the shooting and had some evidence to offer regarding the music still being on and hearing the shots, but he certainly was not witness to anything. But there was evidence that an additional officer was outside, which is where Mr. Sanders placed himself. So that evidence was critical and could have been exculpatory and was not disclosed. Counsel, my question for you is how do we know the jury didn't disregard Lanny's testimony and just rely on Rodney's testimony? I think that the prosecutor's closing argument is evidence of how the case was presented to the jury and ultimately how they would have thought about it. And there's Ninth Circuit support. I believe Ocampo v. Vail, which is cited by the Deputy Attorney General, talks about closing argument and how you can look not only at what was important to the prosecution and what was material in the case, but how a jury probably understood these specific issues that were presented to it. And the prosecutor emphasized that Mr. Thomas was a credible person because he stuck to his guns. He stuck to his principle that he doesn't have to disclose certain people. And that makes him more credible. I don't think that can be overlooked, as well as the fact that, though the prosecutor has said, the Deputy Attorney General has said his credibility was entirely shot, that was not how it was presented to the jury. So I don't believe that's true. And Rodney did have serious problems, both his intoxication, the fact that he was a victim, the fact that his son had been shot and he was focused on that, that he had inconsistencies in his testimony. So given the strength of the defense witnesses, which were quite thorough and consistent with each other, I don't think that they can prove harmlessness. Thank you. Thank you both for your helpful argument. The matter will be submitted.
judges: Tashima, Christen, Rufe